Filed 10/14/22 In re N.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re N.A. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078838 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J286397, J286398, J286399) |
| v. | OPINION |
| A.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Steven Mapes, Judge. Conditionally reversed and remanded with directions.

Katherine A. Clark, under appointment by the Court of Appeal, for Defendant and Appellant, A.M.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant, D.J.

1

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Appellants D.J. (Mother) and A.M. appeal from a juvenile court order terminating their parental rights under Welfare and Institutions Code section 366.26 to their children.[1] Mother and A.M. (Parents) contend that San Bernardino County Children and Family Services (CFS) and the juvenile court failed to comply with requirements imposed by the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and California Indian Child Welfare Act (§ 224 et seq.), referred to collectively as ICWA. CFS concedes this error and agrees that a conditional reversal and remand are necessary to allow for further compliance with ICWA.

Parents also contend the juvenile court erred in terminating their parental rights because there was insufficient evidence that the children were adoptable. We disagree. However, a conditional reversal and remand are necessary to allow CFS and the juvenile court to comply with ICWA.

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code. Because ICWA uses the term "Indian," we do so on occasion as well, not out of disrespect, but because of the need for clarity and consistency, even though we recognize that other terms, such as "Native American" or "indigenous" are preferrable.

2

## II.

## FACTS AND PROCEDURAL BACKGROUND

On August 21, 2020, Mother was in a car accident. Her blood alcohol level was above the legal limit. Mother's three children, Ne. (3 years old), Ti. (5 years old), and Ni. (6 years old) (the Children) were in the car during the accident. The Children sustained abrasions and scrapes, and were transported to the hospital. The car reportedly flipped over four times. Ne. reportedly was in a car seat and Ni. and Ti. shared a seatbelt.

CFS received an emergency response referral alleging severe neglect of the Children and caretaker absence/incapacity. Mother was arrested. She claimed that T.A. was the father of the three Children. Mother and T.A. had criminal histories. Because T.A. could not be located[2] and there were no relatives available to care for the Children, CFS detained the Children.

### A. *Petition and Detention Hearing*

On August 25, 2020, CFS filed dependency petitions on behalf of the Children (Petition). The Petition alleged that Mother had a history of abusing alcohol and a violent criminal history; she failed to protect the Children by not properly restraining them in the car and got into a car accident; T.A. was not a member of Mother and the Children's household; T.A. had a violent criminal history; and T.A.'s whereabouts were unknown (§ 300, subds. (b)(1), (g)).

---

[2] T.A. is not a party to this appeal.

3

At the detention hearing on August 26, 2020, Mother claimed T.A. was the biological father of all three Children. The court ordered the Children detained and ordered visitation.

B. *Jurisdiction and Disposition Hearing*

CFS interviewed Mother on September 3, 2020. She denied a history of alcohol abuse and claimed that at the time of her car accident, her blood alcohol level did not exceed the legal limit. Law enforcement said it was .085 percent several hours after the accident. Mother admitted two of her children were improperly restrained in the car and that she was arrested for driving under the influence (DUI).

According to the jurisdiction/disposition report, the children did not have any developmental delays, although Ti. appeared to have a speech delay. The children reportedly were adjusting well in their foster home. During the jurisdiction/disposition hearing in September 2020, the court sustained the Petition allegations, declared the Children dependents, and ordered reunification services for Mother. The court found T.A. was the alleged father of the Children and not entitled to reunification services. The court ordered supervised two-hour visits for Mother once a week.

C. *Six-Month Hearing*

In November 2020, maternal great grandmother (MGGM) reported that Mother was incarcerated after turning herself in on an outstanding warrant. She was released from custody in January 2021. CFS reported that after her release, Mother failed to show up for drug testing 10 out of 11 times. Mother and the Children's maternal and paternal

grandparents regularly visited the Children. On December 25, 2020, the Children's caretaker, MGGM, died in the Children's presence. The Children were placed with their maternal grandmother (MGM) and then in the foster home of Ms. N. on January 6, 2021.

On December 30, 2020, Ni.'s biological father, A.M., contacted CFS, claiming to be Ni.'s father. He had just been released from prison and informed of the juvenile dependency matter. Mother denied A.M. was Ni.'s father.

CFS reported in its six-month status review report, filed in March 2021, that the Children were all developmentally on target. Ti. was receiving play therapy for behavioral issues, which included cursing, physical aggression with his siblings, spitting, and throwing heavy objects at his caretakers. Ti.'s pediatrician recommended he be evaluated by a psychiatrist for psychotropic medication for a hormone imbalance. After MGGM's death, the Children's caretaker, Ms. N., complained that when Ti.'s siblings observed Ti. acting out, they emulated his bad behavior. Ms. N. told the CFS she intended to submit a seven-day notice for removal. The social worker intervened and deescalated the situation. The Children were all receiving therapeutic services to help mitigate the trauma they experienced and their negative behaviors. They remained in Ms. N.'s home, which is a certified and licensed County foster home.

During the detention hearing on a section 342 petition in September 2021, the court reduced A.M.'s visits with Ni. to once a month. The court adopted CFS's recommended modified findings and orders stated in the September 2021 detention report.

5

D. *Contested Twelve-Month Hearing*

CFS reported in the September 2021 status review report that Mother admitted to having an alcohol problem and was in another DUI car accident. Mother provided two certificates of completion of a substance abuse program and parenting program, but CFS was unfamiliar with the programs. T.A. reportedly had been incarcerated and released, but did not visit the Children. Ni.'s father, A.M., told CFS he smoked THC and was diagnosed with mental health illness, including schizophrenia, anxiety, and PTSD. When CFS learned that A.M. was on felony probation for domestic violence, CFS filed a section 342 petition on September 9, 2021, on behalf of Ni. CFS alleged in the section 342 petition that A.M. had an unresolved history of substance abuse, engaged in domestic violence in Ni.'s presence, and failed to protect her, thus placing her at risk of neglect and abuse. Initially, A.M. was permitted to visit Ni. but the visits became inconsistent, which increased Ni.'s behavioral issues, low self-esteem, and abandonment issues.

Ne. was receiving services to help mitigate his behavioral issues (cursing, hitting, biting, and verbal abuse) occurring when he emulated his older sibling, Ti's bad behavior. Ti.'s behavioral issues included throwing things at his siblings and adults when upset, spitting, cursing, and falsely accusing adults of assaulting him. Ni. often emulated Ti.'s bad behavior and tried to boss her siblings. Ms. N. reported the wraparound services were helping Ni. CFS reported in its September 16, 2021, status report that Ms. N. submitted a seven-day notice several times because of Ti.'s ongoing behavior.

6

Nevertheless, Ms. Ni. was willing to provide a concurrent family home for the Children and adopt them.

At the twelve-month hearing on September 23, 2021, the court set the matter for a section 366.26 hearing.

E. *Combined Section 342 Jurisdiction/Disposition Hearing and Section 366.26 Hearing*

During A.M.'s interview in September 2021, he stated that his contact with Ni. had been sporadic because of his multiple incarcerations. On September 28, 2021, A.M.'s probation officer reported A.M. had been arrested and was incarcerated on charges of expired registration tags and attempting to flee. As of November 2021, A.M. was no longer in custody.

CFS reported in its section 366.26 report filed on September 29, 2021, that the Children's caregiver, Ms. N., said she loves the Children and if they are not placed with relatives, she would like to adopt them. She reported she is invested in them and had worked with them to stabilize their emotions and behaviors. CFS stated in its section 366.26 report filed in January 2022, that many of T.A.'s relatives had requested placement and visitation of the Children but CFS concluded it was unlikely the Children would be placed with them. CFS also concluded it was unlikely MGM would qualify for placement. MGM stated that it would therefore be best to place the Children with their current caretaker, Ms. N., with whom they had resided since January 6, 2021.

7

The Children's diagnoses stated in the January 12, 2022, Health and Education Passport reports were the same as previously reported. The Children were developmentally on-track but continued to display some of the same behavioral issues and were provided wraparound services, which included individual and group/family therapy, and mental health and speech services. CFS again reported that Ms. N. was committed to providing the Children with long-term care and was prepared to adopt them. Ms. N. was willing to allow the Children's family to maintain contact with the Children.

CFS reported in its update report filed in April 2022, that on March 29, 2022, Mother reported she obtained employment at a warehouse and had completed her case plan, including completing parenting and substance abuse classes. A.M. was in custody.

During the combined section 342 jurisdiction/disposition hearing and section 366.26 hearing on April 12, 2022, Mother and T.A. requested legal guardianship instead of terminating parental rights. The Children's attorney requested termination of parental rights. The juvenile court found that the section 342 petition allegations were true. The court also found that A.M. was Ni.'s biological father but denied him reunification services. During the section 366.26 hearing, the court terminated parental rights and freed them for adoption by Ms. N. The court noted the Children were hyperactive but nevertheless concluded they were adoptable. Parents appealed.

III.

ICWA

Parents contend, and CFS concedes, that the juvenile court and CFS failed to comply with ICWA by not adequately inquiring and investigating the Children's Native American ancestry. The parties also agree that, because of ICWA noncompliance, a conditional reversal and remand are necessary. We agree there was noncompliance with ICWA.

A. *ICWA Procedural Background and Facts*

When CFS interviewed Mother on the day of her car accident on August 21, 2020, Mother denied any Native American heritage. CFS reported in ICWA-010 forms attached to the Petition that CFS asked Mother about the Children's Native American status and she gave no reason to believe the Children were Native American children.

On August 26, 2020, Mother and T.A. filled out ICWA-020 forms stating "no" to the statement, "I may have Indian Ancestry." They also stated, "I have no Indian Ancestry as far as I know." In addition, Mother and T.A. filled out Family Find and ICWA inquiry forms denying Native American ancestry. They also denied Native American ancestry during the detention hearing. The jurisdiction/disposition hearing report stated ICWA did not apply but CFS recommended in the report the court find ICWA does or may apply. At the jurisdiction/disposition hearing in September 2020, the court found the Children do or may come under ICWA.

CFS stated in the six-month report filed in March 2021, that Ne. and Ti.'s paternal great grandmother (PGGM) claimed the Children's great-great grandfather (PGGGF)

9

may have been Cherokee.  In January 2022, Ne. and Ti.'s paternal grandmother (PGM) claimed possible Cherokee and Osage heritage.

CFS further reported that in October 2020, MGGM stated she suspected their family may have Blackfoot or Cherokee heritage.  In January 2021, Mother told CFS that she may have Cherokee heritage on her father's side of the family (MGF).  PGM said she might have Cherokee and Osage ancestry on her side of the family  In December 2020, A.M. claimed possible Native American ancestry in the Blackfoot tribe.  CFS, however, recommended that the court find ICWA did not apply.

In March 2021, CFS reported that Ni.'s father, A.M., denied Native American ancestry.  The court ordered CFS to obtain an ICWA-020 form from him.  A.M. also denied Native American ancestry at the 12-month hearing in June 2021.  The ICWA-010 form attached to the section 342 petition stated Mother and A.M. gave no reason to believe Ni. was a Native American child.  There was no discussion of ICWA at the section 342 detention hearing in September 2021, and it was not addressed at the 12-month hearing in September 2021.  At the section 342 jurisdiction/disposition hearing in November 2021, the court stated that CFS had conducted a thorough investigation and that it would be appropriate to notice the tribes and Bureau of Indian Affairs (BIA).

CFS reported in its section 366.26 report filed in January 2022, that ICWA did not apply.  At the combined section 342 jurisdiction/disposition hearing and section 366.26 hearing on January 20, 2022, the court stated it intended to follow up on the ICWA issue

10

during the continued hearing set on April 12, 2022. However, at the section 366.26 hearing on April 12, 2022, the court terminated parental rights without addressing ICWA.

B. *Discussion*

Federal regulations implementing ICWA require that state courts, at the commencement of a juvenile dependency proceeding, "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).) Under California law, the court and county child welfare department also "'have an affirmative and continuing duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' [Citations.] The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883.) State courts must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).)

Here, the parties agree, as do we, that CFS and the juvenile court did not adequately comply with ICWA's requirements to inquire and investigate the Children's Native American ancestry. A conditional reversal and remand are therefore necessary for the purpose of allowing CFS and the juvenile court to fully comply with ICWA's inquiry,

11

investigation, and notice requirements.  If the inquiry produces evidence that the Children are or may be Native American children, then the juvenile court must direct the CFS to give notice of the underlying proceedings and any upcoming hearing in compliance with ICWA.

IV.

SUBSTANTIAL EVIDENCE OF ADOPTIBILITY

Parents contend there was insufficient evidence to support the juvenile court's finding that the Children are adoptable.  We disagree.

A. *Applicable Law*

Whenever the juvenile court sets a section 366.26 hearing, the court is required to direct the CFS to prepare an assessment as part of its report to the court.  (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 11 (*Valerie W.*).)  "The assessment report is 'a cornerstone of the evidentiary structure' upon which the court, the parents and the child are entitled to rely.  [Citations.]  The Agency is required to address seven specific subjects in the assessment report, including the child's medical, developmental, scholastic, mental, and emotional status.  (§ 366.21, former subd. (i).)  In addition, the assessment report must include an analysis of the likelihood that the child will be adopted if parental rights are terminated.  (§ 366.21, former subd. (i)(1), (2), (3), (7); *In re Crystal J.* [1993] 12 Cal.App.4th [407,] 411.)" (*Valerie W.*, *supra*, 162 Cal.App.4th at p. 11.)

Section 366.21, subdivision (i) requires that the assessment report contain: "A preliminary assessment of the eligibility and commitment of any identified prospective

adoptive parent or legal guardian, including the prospective tribal customary adoptive parent, particularly the caretaker, to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship . . . ." (§ 366.21, subd. (i)(1)(D).)

Statements should be included regarding "[t]he relationship of the child to any identified prospective adoptive parent or legal guardian, the duration and character of the relationship, the degree of attachment of the child to the prospective relative guardian or adoptive parent, the relative's or adoptive parent's strong commitment to caring permanently for the child, the motivation for seeking adoption or guardianship, a statement from the child concerning placement and the adoption or guardianship, and whether the child, if over 12 years of age, has been consulted about the proposed relative guardianship arrangements, unless the child's age or physical, emotional, or other condition precludes his or her meaningful response, and if so, a description of the condition." (§ 366.21, subd. (i)(1)(E).) The assessment report must also include "A description of efforts to be made to identify a prospective adoptive parent or legal guardian . . . ." (§ 366.21, subd. (i)(1)(F).)

On review, we determine whether there is "substantial evidence from which the juvenile court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. [Citations.]" (*Valerie W.*, *supra*, 162 Cal.App.4th at p.

13

13.)  "We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment."  (*Ibid*.)

B. *Forfeiture*

CFS argues that Parents forfeited their objections to the adoptability finding because they failed to raise in the juvenile court deficiencies in the assessments included in the section 366.26 hearing report.  CFS further argues that Parents' contention that there was insufficient evidence of adoptability is also forfeited because it is based entirely on their forfeited objection to the section 366.26 report.

We recognize that "[g]enerally, points not urged in the trial court cannot be raised on appeal."  (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17; *In re Brian P.* (2002) 99 Cal.App.4th 616, 623.)  However, the contention that a judgment is not supported by substantial evidence is a well-established exception to the rule.  (*Tahoe National Bank v. Phillips*, *supra*, 4 Cal.3d at p. 23, fn. 17; *In re Brian P.*, *supra*, at p. 623.)  Parents therefore are not precluded from raising for the first time on appeal their challenge to the sufficiency of evidence supporting the juvenile court's finding the Children are adoptable.  "[W]hile a parent may waive the objection that an adoption assessment does not comply with the requirements provided in section 366.21, subdivision (i), a claim that there was insufficient evidence of the child's adoptability at a contested hearing is not waived by failure to argue the issue in the juvenile court."  (*In re Brian P.*, *supra*, 99 Cal.App.4th at p. 623; see also *In re Mary C.* (2020) 48 Cal.App.5th

14

793, 801 [Parents' objections to the adequacy of adoption assessment report forfeited because not raised in the trial court].)

Parents thus did not forfeit their contention that there was insufficient evidence of adoptability. Parents did, however, forfeit their objections to the adequacy of the submitted reports relied on by the court in assessing the Children's adoptability.

C. *The Children's Behavioral Issues*

Adoptability can be established as either general adoptability or specific adoptability. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) When determining adoptability, the court "usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. [Citation.] If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. [Citation.] When the child is deemed adoptable based solely on a particular family's willingness to adopt the child, the trial court must determine whether there is a legal impediment to adoption. [Citation.]" (*Valerie W.*, *supra*, 162 Cal.App.4th at p. 13.)

1. General Adoptability

Parents argue there was insufficient evidence of general adoptability because the Children had unresolved behavioral issues, including Unspecified Trauma and Stressor-Related Disorder. Parents note that the Children's caregiver had several times submitted a seven-day notice requesting removal of the Children because of their bad behavior. Parents also maintain that the assessment reports provide insufficient, minimal

15

information about each child, CFS's adoption assessment was incomplete, and CFS failed to speak to the Children (ages 3, 5, and 6) about adoption.

The Children's young ages and healthy physical condition support a finding of general adoptability. (*Valerie W.*, *supra*, 162 Cal.App.4th at p. 13.) However, there is evidence in the record that the Children's emotional health and bad behavior was challenging for their caretaker. The most recent Health and Education Passport reports state that the Children had difficulty appropriately expressing their feelings and communicating their needs in an age and developmentally appropriate way, resulting in angry and emotional outbursts and verbal aggression.

Although the Children were diagnosed with Unspecified Trauma and Stressor-Related Disorder and CFS reported they have behavioral issues, the diagnoses were made in February 2021. Since then, the Children's behavior reportedly improved as a result of receiving treatment for those issues through wraparound services, including intensive therapy and speech services. The Children's behavioral problems were attributed in part to trauma experienced during a car crash caused by Mother driving with a blood alcohol level above the legal limit, and from experiencing MGGM dying in their presence on Christmas day in 2020.

Because of the Children's behavioral problems, the Children's caretaker, Ms. N., submitted several seven-day notices requesting removal of the Children. Ms. N., however, changed her mind regarding removal and repeatedly told CFS that she wished to adopt the Children. Although the record shows that the Children's behavioral issues

16

were challenging for Ms. N., she reported that the Children had shown significant improvement as a result of services provided to address their issues and she was committed to providing long-term care of the Children, including adoption. Although there is evidence the Children continued to have behavioral issues, evidence of their progress in improving their behavior through therapy and other services supports the court's finding of general adoptability of the Children. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1651 [attributes indicating adoptability include "the minors' young ages and their good physical and emotional health, progress in therapy, intellectual and academic growth, and ability to develop interpersonal relationships"].)

Even though there is evidence that the Children had behavioral problems, there is substantial evidence supporting the juvenile court's finding of adoptability, based on clear and convincing evidence that the Children's emotional health and needs do not rise to the level that would undermine their general adoptability.

## 2. Specific Adoptability

There is also substantial evidence supporting a finding of specific adoptability of the Children by a prospective adoptive parent. A finding that a child is specifically adoptable requires a determination that there are no legal impediments to adoption and there is a prospective adoptive parent who is able to meet the needs of the child. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80; *In re B.D.* (2019) 35 Cal.App.5th 803, 817 (*In re B.D.*)

Parents argue the juvenile court improperly based its determination of adoptability on the sole factor that the caregiver, Ms. N., desired to adopt the Children. Parents assert that Ms. N. submitted several seven-day removal notices for all of the Children and this undermines the adoptability finding without more information provided to explain Ms. N.'s willingness to have the children removed.

"Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.)" (*In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650, citing *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.)

A.M. argues the instant case is similar to *In re Amelia S.* (1991) 229 Cal.App.3d 1060, in which the court of appeal reversed an order terminating parental rights because

18

there was insufficient evidence of adoptability. There, the minors "had various developmental, emotional and physical problems, some of a serious nature." (*Id.* at 1063.) The *Amelia S.* court found the evidence inadequate to satisfy the clear and convincing standard on adoptability. The court explained: "Here, the permanency hearing report indicated a few foster parents were *considering adoption*. This is a far cry, however, from the clear and convincing evidence required to establish the *likelihood* of adoption . . . . [¶] Rather, what is required *is* clear and convincing evidence of the *likelihood* that adoption will be realized within a reasonable time." (*Id.* at 1065, italics added, original italics.)

The instant case is distinguishable from *Amelia S.* in that the section 366.26 report and other evidenced demonstrated that Ms. N. was not only seriously "considering adoption," but had repeatedly stated that, even though she was well aware of the Children's behavioral problems, she wanted to continue to care for them and adopt them.

Mother cites *B.D.* for the proposition the order terminating parental rights should be reversed because CFS failed to provide essential information to the court, including providing an adoptive assessment in compliance with section 366.22, subdivision (c)(1). Mother argues that the planning/adoption assessment in the section 366.26 report was woefully inadequate, with essentially no helpful information. She complains there was no assessment of any prospective adoptive parent's eligibility and commitment; no social history, including a criminal history screening and screening for child abuse and neglect; and no assessment of the prospective adoptive parent's ability to meet the child's needs

19

and other requirements. But any such deficiencies in the section 366.26 report here do not constitute reversible error and *B.D.* is distinguishable.

In *B.D.*, the juvenile court terminated parental rights based on the social services agency's recommended finding the child was likely to be adopted by his foster parents. Less than a month after termination of parental rights, the child was removed from the foster home upon the agency discovering the child had suffered physical abuse while in the foster home. During a series of subsequent hearings regarding the child's removal from his foster parents, it came to light that the agency social worker had failed to disclose in the section 366.26 report that there had been a prior investigation of possible sexual abuse of the child by his foster parent. (*B.D.*, *supra*, 35 Cal.App.5th at p. 810.)

During a post-judgment hearing, the agency accepted responsibility for the incomplete section 366.26 report. On appeal of the order terminating parental rights, the agency did not argue it complied with the obligation to provide a statutorily mandated, informative report. Rather, the agency argued harmless error. The *B.D.* court disagreed and reversed the order terminating parental rights, finding that it was clear that the juvenile court never would have found the child to be specifically adoptable had the juvenile court known the true facts omitted from the report. (*B.D.*, *supra*, 35 Cal.App.5th at pp. 822, 827.)

The instant case is distinguishable from *B.D.* in that, here, the issue of a deficient section 366.26 report was not raised in the juvenile court and evidence was presented demonstrating that the Children were adoptable. There was no evidence presented that

20

the prospective adoptive parent had a history of sexual abuse or had sexually abused the Children and could not legally adopt them. Unlike in *B.D.*, the record does not show any prejudicial error and there is substantial evidence of adoptability.

The section 366.26 report filed on January 12, 2022, provided much of the information required by section 366.22, subdivision (c)(1). Ms. N. is identified in the report as the prospective adoptive parent. Information is limited but sufficient regarding her social history, including her capability to meet the Children's needs and understanding of the legal and financial rights and responsibilities of adoption and guardianship. The January 12, 2022, report further states that the Children were appropriate for adoption. CFS states in the report that Ms. N. was committed to the Children's long-term care, and the Children had acclimated well to their placement. The Children had resided with her for one year (since January 6, 2021). Ms. N. and the Children had reportedly developed a mutual attachment with each other, and Ms. N. stated she was committed to raising them to adulthood.

The section 366.26 hearing report states that Ms. N. "is capable to adopt. The children are an appropriate age, and have developed successfully under the care, and tutelage, of [Ms. N.] [Ms. N.] requests open adoption, and wants to maintain the children's biological relationships. [Ms. N.] is prepared for the adoption process and continues to support the needs of the children." Although the report does not provide specific information on whether Ms. N. has any criminal or CFS history, Parents did not object to these omissions during the section 366.26 hearing, and CFS reported Ms. N.'s

home had been certified and licensed as a county foster home. This suggests she did not have a criminal or CFS history, and Parents did not request an update or supplemental information, thereby forfeiting any deficiency in the information provided in the report. Although CFS's reports may not have fully complied with the requirements of section 366.22, Parents forfeited any objections by not objecting to any such deficiencies. Furthermore, substantial evidence supports findings of general and specific adoptability of the Children.

Mother also relies on *Valerie W.*, *supra*, 162 Cal.App.4th 1, in which the court reversed an order terminating parental rights on the ground there was insufficient evidence to support the juvenile court's finding of adoptability because the assessment report was egregiously deficient. (*Id.* at pp. 4-5, 14.) The court in *Valerie W.*, noted that "'Deficiencies in an assessment report . . . go to the weight of the evidence,'" but "'if sufficiently egregious may impair the basis of a court's decision to terminate parental rights.'" (*Id.* at p. 14.) Mother argues *Valerie W.* is factually similar to the instant case. We disagree.

In *Valerie W.*, the assessment report failed in most respects to comply with the section 366.21, subdivision (i) requirements by failing to report the medical testing results of one of the children who suffered from seizures; failing to identity both prospective adoptive parents; and failing to include a social history for each prospective adoptive parent, the relationship between each child and each of the prospective adoptive parents, each prospective adoptive parent's motivation to jointly adopt, the absence of an

22

approved home study, the lack of any assessment of the prospective adoptive parents'

ability to meet the needs of the child who may have had a serious genetic or neurological

disorder; and the lack of evidence of that child's condition, prognosis and treatment

needs. (*Valerie W.*, *supra*, 162 Cal.App.4th at pp. 13-14.)

The *Valerie W.* court concluded these deficiencies in totality were so egregious as

to undermine the basis of the court's decision to select adoption as the children's

permanent plan and terminate parental rights. (*Valerie W.*, *supra*, 162 Cal.App.4th at pp.

14-15.) In addition, in *Valerie W.*, unlike here, the juvenile court failed to determine

whether there was a legal impediment to the prospective adoptive parent and her daughter

jointly adopting the children, or whether the court was even aware that both intended to

adopt the children jointly. (*Valerie W.*, *supra*, at p. 15.)

Here, the facts significantly differ from those in *Valerie W.* and, unlike in *Valerie*

*W.*, the deficiencies in the assessment report are nowhere near as prolific or as egregious

as to impair the basis of the juvenile court's finding of adoptability and decision to

terminate parental rights.

V.

DISPOSITION

The judgment terminating parental rights to the Children is conditionally reversed.

The matter is remanded to the juvenile court with directions to comply with the inquiry

and notice provisions of ICWA. On remand, the court must inquire of A.M. as to

paternal Native American ancestry, and ensure that CFS fully investigates and takes

reasonable steps to ascertain whether the Children have paternal Native American ancestry and gives ICWA notices, as appropriate.

If ICWA notices are required and properly given, and the tribes or the BIA do not respond to the ICWA notices, or respond that the Children are not Native American children, the judgment terminating parental rights to the Children shall immediately be reinstated and further proceedings shall be conducted, as appropriate. If any tribe or the BIA determines the Children are Native American children, the court shall proceed accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

Acting P. J.

We concur:


FIELDS

J.


RAPHAEL

J.